# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| **DEBORAH D. HENNING,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CAUSE NO. 1:11-CV-00135** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Plaintiff Deborah Henning appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Henning's date last-insured ("DLI") for DIB was December 31, 2004 (Tr. 58), and thus

she must show she was disabled by that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th

Cir. 1997).  Henning applied for DIB in January 2002, alleging disability as of December 12,

2001.[2] (Tr. 60-62.)  The Commissioner denied her application initially and upon reconsideration,

and Henning requested an administrative hearing. (Tr. 26-42.)  On March 15, 2005, a hearing

---

[1] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

[2] Henning also applied for SSI in her original application and then later filed a second claim for SSI; these
applications were denied, however, due to "incumbent resources."  (Tr. 824.)  Henning is not appealing the denial of
her SSI applications. (Tr. 824.)

was conducted by an Administrative Law Judge ("ALJ") Frederick McGrath, at which Henning (who was represented by counsel), her husband, and a vocational expert ("VE") testified. (Tr. 427-73.) On September 12, 2005, the ALJ rendered an unfavorable decision to Henning (Tr. 13-17A), which, after the Appeals Council denied her request for review, became the final decision of the Commissioner (Tr. 5-9).

Henning filed a complaint with this Court on April 3, 2006, seeking relief from the Commissioner's final decision. *See Henning v. Barnhart*, No. 1:06-cv-104 (N.D. Ind. filed Apr. 3, 2006). On April 17, 2007, the Court reversed the Commissioner's final decision and remanded the case for further proceedings. (*Id*. at Docket # 17.) A second hearing was held before ALJ McGrath on August 13, 2007, at which Henning (who was represented by counsel) and a VE testified. (Tr. 807-20.) On April 28, 2008, ALJ McGrath issued another unfavorable decision to Henning. (Tr. 791-97.) In response to Henning's request for review, the Appeals Council remanded the case for a new hearing. (Tr. 490.)

On November 18, 2009, ALJ Steven Neary conducted a hearing at which Henning (who was represented by counsel), her husband, and a VE testified. (Tr. 821-57.) On April 28, 2010, the ALJ issued another unfavorable decision to Henning, finding that she could perform a full range of work at all exertional levels despite the limitations caused by her impairments. (Tr. 490-501.) This time the Appeals Council denied her request for review, making ALJ Neary's decision the final decision of the Commissioner. (Tr. 474-76.)

## II. HENNING'S ARGUMENTS

Henning alleges two flaws with the Commissioner's final decision. Specifically, she claims that the ALJ: (1) improperly evaluated the opinion of her treating psychiatrist, Dr. Patel;

and (2) improperly discounted the credibility of her symptom testimony.

### III. FACTUAL BACKGROUND[3]

*A. Background*

At the time of her DLI, Henning was forty-six years old, had a high school education and training as a nurse's aid, and possessed past relevant work as a cashier/checker, cook, dishwasher, inspector, wire worker, and wire harness worker. (Tr. 60, 79, 173.)  She alleges that she is disabled due to status post broken foot, acid reflux, gastritis, headaches, low back pain, and major depression. (Opening Br. 3.)  Because Henning does not challenge the ALJ's consideration of her physical impairments, the Court will focus on the evidence pertaining to her mental limitations.

At the 2009 hearing, the ALJ explained at the outset that he was focusing on the evidence prior to Henning's DLI in 2004. (Tr. 824.)  Henning stated that as of her DLI she lived with her husband and performed her self care independently. (Tr. 837.)  She also did housework, including some cooking and preserving; drove a car; and went grocery shopping; her hobbies included fishing and trying new recipes. (Tr. 838.)  She occasionally visited with a neighbor. (Tr. 838-39.)

Henning testified that she quit her last job in 2001 and could not return to work because of her paranoia. (Tr. 829-30, 840, 842-44.)  She elaborated that she was very "leery of people," does not "trust" them, and has difficulty socializing with others. (Tr. 831.)  She also claimed that she had concentration problems and that her medication made her sleepy, which affected her ability to work. (Tr. 832-35.)  She stated that she had trouble keeping up at work and that people

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 857-page administrative record necessary to the decision.

often talked about her, which upset her. (Tr. 842-45.)

When asked if her drug and alcohol use affected her ability to work, Henning represented that she did not use substances between 2001 and her DLI, and more specifically, had not smoked marijuana since 2002. (Tr. 835.) When the ALJ confronted her with Dr. Patel's October 2005 note indicating that she still smoked marijuana and his December 2006 note reflecting that she was still imbibing "moderate alcohol," Henning responded that Dr. Patel's notes were wrong. (Tr. 835-36.)

Henning's husband also testified at the hearing. (Tr. 845-50.) He stated that Henning had anxiety, but did not miss work because of her problems; he elaborated that she would be upset when she got home from work, but that she would calm down after a couple of hours. (Tr. 847-48.) He did not think she had difficulty getting along with people anymore. (Tr. 847.) If she was in a good mood, which was about fifty percent of the time, she had no problem going out into the community; on a bad day, however, she had difficulty concentrating and preferred to stay at home. (Tr. 849.) He testified that she took forty-minute naps between two and six times a day. (Tr. 848.)

### B. Summary of the Relevant Medical Evidence

Henning first visited Dr. Jay Patel, a psychiatrist, in May 1989 when she was attempting to reconcile with her husband. (Tr. 315.) She reported feel paranoid at times, and he prescribed medication. (Tr. 315.) In July, she no longer felt paranoid. (Tr. 314.) He noted that she expressed herself better, but still had some inappropriate affect. (Tr. 314.) In November, Henning returned to work and reported that she felt better when working. (Tr. 314.) Although she occasionally felt paranoid, Dr. Patel did not think her symptoms were truly paranoia. (Tr.

314.)

In 1990, Henning told Dr. Patel that her sleep, appetite, and marital relationship were satisfactory. (Tr. 312, 315.) In February 1991, Henning informed Dr. Patel that she was upset with a co-worker and wanted medication so that she could "function"; he prescribed Xanax. (Tr. 310.) In May, she reported that she again felt satisfactory, but in August said that she was so tired of work that she was unable to function; Dr. Patel added Prozac. (Tr. 308-09.) In November Henning reported that she felt exhausted. (Tr. 309.)

In 1992, Henning admitted herself to Med Park in order to quit smoking marijuana. (Tr. 308.) She saw Dr. Kaufman, who adjusted her medications; she later became angry at him, however, and returned to Dr. Patel. (Tr. 308.) He noted that she was somewhat suspicious, and he adjusted her medications. (Tr. 308.) In November, Henning reported that she was sleeping a lot and not functioning well at work; however, she was not paranoid. (Tr. 307.) She was then laid off from her job. (Tr. 307.)

In January 1993, Henning reported to Dr. Patel that she was doing better, but in March she said she still felt paranoid at times. (Tr. 305.) In September, Henning was not working and stated that she does not like to work. (Tr. 305.) In February 1994, Henning reported that it was a bad month and that she felt depressed. (Tr. 305.) In the following months, Henning reported no problems with her medication, but did complain of drowsiness. (Tr. 304.) In December, she stated that she was fired from her job at McDonald's because she could not keep up. (Tr. 304.)

In April 1995, Henning reported no side effects from her medication; in August, she was tearful due to some custody problems. (Tr. 303-04.) In January 1996, Henning stated that she wanted to have a baby, and Dr. Patel informed her she could not take her medication if she did.

(Tr. 303.)  In May, she felt paranoid, but improved after a medication adjustment. (Tr. 303.)  In August, she reported that she was tired, but was not hearing voices. (Tr. 303.)  In November, she felt down due to her finances. (Tr. 303.)

In February 1997, Henning reported that she was working, but felt lethargic. (Tr. 303.)  Dr. Patel noted at another visit that when he reduced the Navane, she felt more paranoid. (Tr. 301.)  Later that same month, Henning stated that she was no longer sleepy during the day. (Tr. 301.)  Henning quit her job in March and was looking for other work. (Tr. 299.)  In April, she reported she felt angry and paranoid, which caused her difficulty on the job. (Tr. 299.)  Dr. Patel increased her Zyprexa and Zoloft, as he noted she was suspicious, angry, and complaining of depression. (Tr. 299.)  In June, Henning had taken a new job and was in better spirits, even though sometimes she felt that people were talking about her. (Tr. 298.)  In August, she reported sleeping too much, weight gain, and crying all day. (Tr. 298.)  In October, she quit her job and got another one. (Tr. 298.)

In February 1998, Henning reported that she was tired and felt paranoid. (Tr. 297.)  She also reported feeling depressed and that she had quit her job. (Tr. 297.)  She told him that she did not want to work. (Tr. 297.)  In June, she reported that she still was not motivated to do things but that she had started working part time (Tr. 297); by October, however, she had quit her job (Tr. 295).  In February 1999, she reported feeling okay. (Tr. 295.)  Several months later, she reported smoking marijuana once a month and that she did not want to stop. (Tr. 295.)  At the end of the year, she reported that things were satisfactory and that she wanted to stop smoking cigarettes. (Tr. 294.)

In May 2000, Henning told Dr. Patel that she could not function at work and felt

overwhelmed. (Tr. 294-95.)  In July, she stated that her husband left her and that she had to go to work. (Tr. 294.)  She admitted that she felt anxious and had smoked marijuana two months earlier. (Tr. 294.)  She had quit her job and started a new job at McDonald's. (Tr. 293.)  In December, she indicated that she was not doing very well, had separated from her husband, and had started dating someone else. (Tr. 293.)  She failed to show for two of her appointments in 2001. (Tr. 293.)  In April 2001, Henning ran out of her medications due to her limited finances; she was still working at McDonald's. (Tr. 293.)  In August, she said that she had smoked marijuana two months earlier and was drinking three to four beers, two to three times a week. (Tr. 338.)  She was dating and happy, sleeping okay, and working part time; Dr. Patel did not change her treatment. (Tr. 292A-93.)  At the end of 2001, Henning indicated that she was making too many mistakes at work and that she had quit. (Tr. 338.)

Also in April 2001, Henning was evaluated by Bryan Ciula, Ph.D., at the request of the State of Indiana to determine Medicaid eligibility. (Tr. 328-30.)  She reported that she drank alcohol about twice a week and smoked marijuana three or four times a year; she had worked at a fast food restaurant since November 2000. (Tr. 329.)  On mental status exam, she showed no evidence of a thought disorder, but her affect was rather flat. (Tr. 329.)  She was pleasant and cooperative, manifested only slight psychomotor retardation, performed serial threes correctly, exhibited good abstract thinking, identified similarities and differences between common items, displayed adequate judgment, and recalled three items following a five-minute delay. (Tr. 497.)  She denied significant depression, but did think people were talking about her at work and that she was being followed. (Tr. 329.)  She reported some insomnia, anhedonia, and difficulty with concentration. (Tr. 329.)  Dr. Ciula diagnosed Henning with history of clinical depression, which

appeared to be in partial remission; schizoaffective disorder, depressive type; and alcohol dependence. (Tr. 329.)

On April 10, 2002, Warren Sibilla, Ph.D., evaluated Henning at the request of the Social Security Administration. (Tr. 339-42.) She denied having any current symptoms of depression and stated that her current vocational goal was to be a housewife; she denied any history of being fired. (Tr. 340.) She reported a history of alcohol abuse and that she currently drank four to six beers four or five times a week. (Tr. 340.) On mental status exam, her thoughts were generally goal-directed and topic-specific. (Tr. 341.) Henning interpreted three simple proverbs, correctly identified how two of three pairs of items were alike and different from one another, answered four simple math calculations, performed serial threes in eleven seconds with no errors, answered one of three simple judgment and insight questions, answered two of three simple information questions, and recalled two of three words after a ten-minute interval. (Tr. 497.) She reported minimal to mild difficulty with daily living activities. (Tr. 340.) Dr. Sibilla observed that Henning offered no symptom history to support a thought disorder and that her symptoms most resembled a generalized anxiety disorder. (Tr. 340-41.) He diagnosed her with generalized anxiety disorder and a question of alcohol use/abuse and assigned her a Global Assessment of Functioning ("GAF") score of 70/75.[4] (Tr. 341.)

In July 2002, F. Kladder, Ph.D., a state agency psychologist, reviewed Henning's record

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." Id. And, a GAF score of 71 to 80 reflects that if symptoms are present, they are transient and expectable reactions to psychosocial stressors and there is no more than a slight impairment in social, occupational, or school functioning. Id.

and found that she had mild restrictions in daily living activities; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 353-66.)  He concluded that her mental impairments were not severe. (Tr. 353.)  His opinion was later affirmed by a second state agency psychologist. (Tr. 367.)

In May 2002, Henning saw Dr. Patel for the first time in six months; she told him that her mood and sleep were satisfactory. (Tr. 338.)  He continued her medications at the same dosages. (Tr. 337-38.)  In August, Henning reported that she got remarried and was not working. (Tr. 338.)  She reported smoking marijuana in the past six months and that she felt "spacy" sometimes. (Tr. 338.)  At her last appointment in 2002, she said she was getting paranoid in that she thought people were following her; Dr. Patel increased her Risperidone. (Tr. 416.)  In May 2003, Henning again told Dr. Patel that she was making mistakes, forgetting things, and thought people were making fun of her; Dr. Patel maintained her medications. (Tr. 416.)  In May, she said she was sleepy during the daytime; she denied using marijuana, and Dr. Patel maintained her medications. (Tr. 416.)  In September, she again denied using marijuana; she was tearful and hyperventilating, reporting that she felt paranoid and that her husband wanted her to go to work. (Tr. 415.)  Henning was feeling better by December and still was not smoking marijuana; Dr. Patel observed that her affect was brighter and her mood was neutral. (Tr. 415.)  In June 2004, Henning saw Dr. Patel for the first time in six months; she represented that she had not smoked marijuana in two years. (Tr. 415.)  She still worried about little things and felt on some days that people were watching her; Dr. Patel decreased her Zoloft. (Tr. 415.)

In October 2004, Dr. Patel completed a two-page narrative report, representing that he had reviewed the results of the two psychological evaluations performed by Dr. Sibilla and Dr.

Ciula, as well as his own clinical notes. (Tr. 369.)  He stated that he had last seen Henning four months earlier. (Tr. 369-70.)  He assigned her a current GAF of 60 and a diagnosis of major depression with psychotic features; possible schizoaffective disorder; and alcohol dependence and drug abuse, marijuana and crack. (Tr. 369.)  He reported that since January 1998, Henning primarily took Zoloft and Risperdal. (Tr. 369.)  He indicated she felt paranoid and sleepy, and that at times she cried and hyperventilated, especially when her husband said he wanted her to work. (Tr. 369.)  Dr. Patel also documented Henning's complaints of problems with concentration, memory, making too many mistakes at work, and in getting along with people. (Tr. 369.)  He indicated that she reported quite a bit of anxiety, but her mood was neutral and her energy was normal; he also noted that she has intermittent delusions that people were following her or talking about her. (Tr. 370.)  Dr. Patel represented that she functioned at the low average mental ability and had fair insight and judgment, but very poor social skills; she was a loner. (Tr. 370.)  Dr. Patel opined that Henning may not be able to work because every time she tried to go back to work, she ultimately quit or was fired due to an inability to function. (Tr. 370.)

Dr. Patel also completed a medical source statement on Henning's behalf in June 2004. (Tr. 374-75.)  He opined that she had no useful ability to function in the areas of maintaining attention and concentration for extended periods, work with or near others without being distracted, perform at a consistent pace, interact appropriately with the public, and get along with coworkers and peers. (Tr. 374-75.)  In addition, at the ALJ's request, Dr. Patel provided a report in April 2005 about Henning's cocaine use. (Tr. 421.)  He indicated that he was aware of her cocaine abuse only from the 1989 records of Parkview Behavior Health and that otherwise he had no knowledge of such a problem. (Tr. 421.)

In October 2005, Dr. Patel documented that Henning had a lot of physical problems and that she was still smoking marijuana; he continued her Risperdal and Zoloft. (Tr. 569.) In April 2007, Dr. Patel wrote that Henning was smiling and cooperative, had a bright affect, logical thoughts, and had no major complaint about the medications; he indicated that she was a housewife. (Tr. 568.) In October 2007, Henning told Dr. Patel that aside from her allergies and her weight, she was "doing better" and had "[n]o other complaints"; he noted that she had a "bright affect" and no side effects from medication. (Tr. 778.)

In June 2008, Henning told Dr. Patel that she was "doing all right with the current medication"; he noted that her thoughts were clear, but she was still overweight and was struggling financially. (Tr. 777.) He scheduled to see her in six months. (Tr. 777.) In December 2008, Henning reported that she was tired, but her general mood was happy and she had no major side effect from her medications; he scheduled to see her in six months. (Tr. 776.) In June 2009, Dr. Patel indicated that Henning had no complaints other than that she had recently had pneumonia, was overweight, and was struggling to quit smoking. (Tr. 775.) Otherwise, he documented that she emotionally was "quite stable," that she was not hearing voices, and that her mood was "not up and down." (Tr. 775.) He also noted that she did not have any side effects from her medications. (Tr. 775.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On April 28, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 490-501.) He found at step one of the five-step analysis that Henning had not engaged in substantial gainful activity since her alleged onset date, and at step two that she had the following severe impairments: generalized anxiety disorder; major depression with psychotic features; possible schizoaffective disorder; alcohol dependence, in full remission; and marijuana and cocaine abuse, in full remission. (Tr. 493.) At step three, the ALJ determined that Henning's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 494.)

Before proceeding to step four, the ALJ determined that Henning's symptom testimony

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

was "somewhat exaggerated and not entirely credible" (Tr. 500) and assigned her the following RFC:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels. She has non-exertional limitations which preclude her from working with the public and in close proximity to others and from performing work that requires the cooperation of others.

(Tr. 496).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Henning was able to perform her past relevant work as a packer and wire worker despite the limitations caused by her impairments. (Tr. 500.) Accordingly, Henning's claim for DIB was denied. (Tr. 500-01.)

### C. The ALJ's Consideration of Dr. Patel's Opinion Is Supported by Substantial Evidence

Henning first challenges the ALJ's discounting of the opinion of Dr. Patel, her treating psychiatrist, who indicated that she was unable to work and had no useful ability to function in the areas of maintaining attention and concentration for extended periods; working with or near others without being distracted; performing at a consistent pace; and interacting appropriately with the public, her coworkers, and peers. Henning's argument, however, essentially amounts to a plea to this Court to reweigh the evidence, which it cannot do. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (explaining that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence").

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2).

However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(c)(2).

Furthermore, a claimant is not entitled to DIB simply because her treating physician states that she is "unable to work" or "disabled." *Clifford*, 227 F.3d at 870; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. § 404.1527(e)(1). Although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. § 404.1527(e); SSR 96-5p. The RFC assessment "is based upon consideration of *all* relevant evidence in the case record, including medical evidence and relevant nonmedical

evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p (emphasis added); *see* 20 C.F.R. § 404.1545. Thus, a medical source opinion concerning a claimant's work ability is not determinative of the RFC assigned by the ALJ. *See* SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.").

Here, the ALJ penned *more than two entire pages* on Dr. Patel's records, narrative report, and medical impairment questionnaire. (Tr. 497-99.) He acknowledged that Dr. Patel thought Henning had no useful ability to maintain attention and concentration for extended periods; work with or near others without distraction; perform at a consistent pace; and interact with public, coworkers, and peers. (Tr. 497.) The ALJ also noted Dr. Patel's finding that Henning could perform a number of mental activities satisfactorily some of the time, but not most of the time. (Tr. 497.) Nonetheless, after this extensive review, the ALJ concluded that Dr. Patel's opinion was not well-supported by the diagnostic techniques and was inconsistent other substantial evidence of record, and thus could not be afforded controlling weight. (Tr. 497); *see Johansen*, 314 F.3d at 287; *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(c)(2).

In support of his conclusion that Dr. Patel's opinion lacked the support of diagnostic techniques, the ALJ first observed that no significant limitations were noted during Dr. Ciula's April 2001 examination or Dr. Sibilla's April 2002 evaluation. (Tr. 497.) Specifically, the ALJ observed that during Dr. Ciula's examination Henning was pleasant and cooperative, manifested only slight psychomotor retardation, performed serial threes correctly, exhibited good abstract

thinking, identified similarities and differences between common items, displayed adequate

judgment, and recalled three items following a five-minute delay. (Tr. 497.) And the ALJ noted

that during Dr. Sibilla's evaluation, Henning interpreted three simple proverbs, correctly

identified how two of three pairs of items were alike and different from one another, answered

four simple math calculations, performed serial threes in eleven seconds with no errors,

answered one of three simple judgment and insight questions, answered two of three simple

information questions, and recalled two of three words after a ten-minute interval. (Tr. 497.)

Henning contends, however, that in citing the findings of other medical source opinions,

the ALJ "misunderstands the test for whether a treating physician's opinion is well supported by

diagnostic techniques . . . ." (Opening Br. 15.) She emphasizes that Social Security Ruling 96-2p

refers to "clinical and laboratory diagnostic techniques *that the medical source uses*," not the

clinical findings of other medical sources. (Opening Br. 16 (emphasis in original) (citing SSR

96-2p).) Henning then contends that the ALJ "committed legal error" by failing to determine

whether Dr. Patel's opinion was well-supported by the clinical techniques that he used. (Opening

Br. 16.)

But the ALJ *did* consider some of Dr. Patel's diagnostic findings. *See generally Rice v.

Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (stating that when reviewing an ALJ's decision, a

court will "give the opinion a commonsensical reading rather than nitpicking at it" (citation

omitted)). For example, the ALJ considered that although Dr. Patel stated in his narrative report

that Henning sometimes heard voices, his treatment notes indicated that she repeatedly denied

hearing voices during the relevant period. (Tr. 499); *Clifford*, 227 F.3d at 871 ("[I]nternal

inconsistencies may provide good cause to deny controlling weight to a treating physician's

opinion.").  The ALJ also discussed that Henning's complaints of paranoia were intermittent and that Dr. Patel responded conservatively to these complaints with little or no adjustments in medication. (Tr. 499.)

In addition, the ALJ noted that although Henning complained of sleepiness, Dr. Patel's treatment records did not reflect any significant problems due to medication side effects and that he made adjustments in the medication dosages as needed. (Tr. 493.)  The ALJ also thought that the severe limitations indicated by Dr. Patel in his narrative report were internally inconsistent with the GAF score of 60 he assigned, which reflected only moderate symptoms. (Tr. 499); *see Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("The ALJ was allowed to conclude that [the treating physician's] notes do not provide adequate clinical support for [such physician's] opinion on the residual capacity form."); *Brumfield v. Astrue*, No. 06-cv-947, 2008 WL 878196, at *3 (S.D. Ill. Mar. 28, 2008) (discounting a treating physician's opinion where the GAF score he assigned reflected a "moderate" impairment rather than the "marked" limitations he opined).

In any event, Henning's challenge to the ALJ's discussion of "diagnostic techniques" is ultimately of little moment because the ALJ *also* observed that Dr. Patel's opinion was inconsistent with "other substantial evidence in the case record," which is another reason it cannot be afforded controlling weight. *See Johansen*, 314 F.3d at 287; *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(c)(2).  Specifically, the ALJ viewed Dr. Patel's opinion as inconsistent with the clinical findings and conclusions of Dr. Ciula and Dr. Sibilla, and notably, the GAF score of 70/75 assigned by Dr. Sibilla, in addition to other evidence of record. (Tr. 497-98.)

Henning argues, however, that Dr. Patel's assignment of severe limitations is "not inconsistent" with the evaluations of Dr. Ciula and Dr. Sibilla.  But that argument has little

traction; after specifically examining Henning's mental status, neither Dr. Ciula nor Sibilla chose to assign Henning any mental limitations, with Dr. Sibilla indicating that Henning had only "minimal to mild difficulty in her usual and customary daily activities and advanced daily living skills as a consequence of her alleged disability." (Tr. 342); *cf. Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) (articulating that where the claimant saw her family physician purely for her physical ailments, the physician's failure to mention claimant's mental problems was not inconsistent with a psychiatrist's opinion expressing severe limitations).  And, as detailed earlier, the clinical findings from the mental status examinations of Dr. Ciula and Dr. Sibilla fall rather far afield of Dr. Patel's "no useful ability to function" representations.

Furthermore, Dr. Ciula stated that Henning reported no history of auditory hallucinations, but Dr. Patel indicated in his narrative report that at times she heard voices. (*Compare* Tr. 329, *with* Tr. 369.)  Moreover, just months before her alleged onset date, Henning denied having any significant depression to Dr. Ciula, indicating that "things are going pretty good." (Tr. 329.) Similarly, the ALJ viewed Dr. Sibilla's assignment after Henning's alleged onset date of a GAF score of 70/75, indicating only a slight or mild mental impairment, to be quite inconsistent with Dr. Patel's report of "no useful ability to function" in several work-related mental activities. (Tr. 498.)  Therefore, the ALJ's conclusion that Dr. Patel's severe limitations are inconsistent with the reports of Dr. Ciula and Dr. Sibilla, and thus that Dr. Patel's opinion is not entitled to controlling weight, is supported by substantial evidence.[6] *See Hofslien v. Barnhart*, 439 F.3d

---

[6] The ALJ also found Dr. Patel's opinion of severe limitations inconsistent with Henning's rather conservative treatment program consisting of medication, but no counseling or hospitalizations, and the failure by Dr. Sharp, her family physician, to mention any mental limitations. (Tr. 498-99.)  Henning challenges both of these examples.  She first emphasizes that an ALJ may not "play doctor" by making a medical judgment beyond his ken concerning the appropriateness of a treatment plan. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).  Next, she points out that the failure of a family physician to mention any mental problems is not necessarily

375, 376 (7th Cir. 2006) (explaining that the Social Security regulations require an ALJ to give controlling weight to a treating physician's opinion only when it is both well-supported by objective medical evidence and is not inconsistent with other substantial evidence of record).

After concluding that Dr. Patel's opinion was not entitled to controlling weight, the ALJ then reviewed the various factors used to determined the amount of weight to afford to the opinion. *See Moss*, 555 F.3d at 561; *Bauer*, 532 F.3d at 608; 20 C.F.R. § 404.1527(c). The ALJ noted that several of the factors favored Dr. Patel, including that he had treated Henning on a regular basis since 1989 and that he was a psychiatrist. In contrast, Dr. Ciula and Dr. Sibilla were psychologists and examined Henning just one time. (Tr. 498.) The ALJ also noted that Dr. Sibilla did not provide a specific explanation for his assessment, while Dr. Patel provided a two-page narrative opinion. (Tr. 498.) Nevertheless, the ALJ concluded that although Dr. Patel's opinion would generally be entitled to great weight, the determining factor in assessing the weight to assign to a medical source opinion is whether it is "supported by and consistent with the evidence." (Tr. 498.)

The ALJ then emphasized that Dr. Ciula's and Dr. Sibilla's mental status examinations and Dr. Patel's treatment notes simply did not reveal significant functional difficulties and thus were inconsistent with Dr. Patel's June 2004 narrative opinion assigning severe limitations. (Tr.

---

inconsistent with a psychologist's opinion of severe limitations where the claimant saw the family physician for her physical ailments. *Wilder*, 64 F.3d at 337 ("The medical records were of purely physical ailments for which Wilder had sought help, and there is no reason to expect a doctor to ask about an eye problems, or a back pain, or an infection of the urinary tract to diagnose depression . . . . He is not looking for it, and may not even be competent to diagnose it."). Although these arguments by Henning are more persuasive, they ultimately do not change the outcome here because the inconsistencies enumerated by the ALJ between Dr. Patel's opinion and Dr. Ciula's and Dr. Sibilla's opinions still preclude the assignment of controlling weight to Dr. Patel's opinion. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

498.)  The ALJ reviewed some of the inconsistencies of record already described above, such as (1) that Dr. Patel's narrative report reflected Henning sometimes heard voices, but his treatment notes repeatedly indicated that she was *not* hearing voices; (2) that although Henning had some problems with paranoia, her complaints were not of a persistent nature and, in response, Dr. Patel either made no, or only slight, adjustments, in her medication therapy; (3) that Dr. Patel's treatment records subsequent to December 2004 shifted to Henning's physical complaints and generally referred to her as happy and emotionally stable; and (4) that the GAF score of 60 assigned by Dr. Patel, indicating moderate symptoms, was inconsistent with the severe limitations he described. (Tr. 499.)  Of course, "if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." *Murphy v. Astrue*, 454 F. App'x 514, 519 (7th Cir. 2012) (unpublished) (quoting *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)).

Henning, however, challenges several of the ALJ's findings concerning these inconsistencies.  She first asserts that the ALJ "played doctor" when he considered the type of treatment that Dr. Patel prescribed in response to her complaints of paranoia and other symptoms.  But in weighing a physician's opinion, the ALJ is instructed to look at the treatment that the source has provided. 20 C.F.R. § 404.1527(c)(2)(ii); *see Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (considering that the claimant's treatment was "relatively conservative" when affirming the ALJ's decision).  Here, the ALJ correctly observed that Dr. Patel's treatment course consisted solely of medication management with few complaints of side effects by Henning.

Henning also contends that the ALJ "cherry-picked" the evidence when discussing Dr.

21

Patel's treatment notes and GAF score, emphasizing that she also complained to Dr. Patel that she was sleepy in the daytime; that people were making fun of her; that she was making mistakes, forgetting things, and tearful at times; and that Dr. Patel thought her mental functioning would decrease if she returned to work. (Opening Br. 21.) She emphasizes that "[t]here can be a great distance between the patient who responds to treatment and one who is able to enter the workforce . . . ." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). But the ALJ *did* consider the complaints that Henning describes, engaging in a discussion of both positive and negative aspects of Dr. Patel's treatment notes in order to build his reasoning. (*See* Tr. 495-96, 499); *see, e.g.*, *Sutherland v. Astrue*, No. 2:11-cv-24, 2012 WL 911898, at *10 (N.D. Ind. Mar. 15, 2012) (finding the claimant's argument that the ALJ had cherry-picked the doctor's records unpersuasive). Ultimately, however, the ALJ found Henning's complaints in the treatment records to be at odds with the severity of the restrictions assigned by Dr. Patel, and it is not the Court's job to reweigh this evidence. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("[The Court may not] reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner."); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996) ("[S]o long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits.").

Moreover, the ALJ also observed that before Henning quit her job in December 2001, she was able to work on a "fairly consistent basis" and there was no sign of any deterioration in her condition after her alleged onset date that would explain why she was able to work prior to December 2001 and not thereafter. (Tr. 500.) Henning points out, however, that her earnings

record reflects that she held primarily short-term jobs with only intermittent periods of stable earnings. (*See* Tr. 56, 128); *see Kangail v. Barnhart*, 454 F.3d 627, 629-30 (7th Cir. 2006) (articulating that where a claimant can hold a job for only a short period of time, the claimant is not capable of substantial gainful activity).

At the hearing, the ALJ questioned Henning extensively about her work history. (Tr. 432-44.) Although she attributed many of her job exits to her difficulties in getting along with others and keeping up the work pace, in at least in one instance Henning quit her job because she was "moving" and they "cut her hours." (Tr. 438.) And, although the record indicates that many of her jobs were indeed short term, Henning was still able to obtain new employment relatively soon after leaving a job, and thus the ALJ's observation that she worked on a "fairly consistent basis" has some support in the record. Furthermore, the ALJ assigned Henning an RFC that precluded her from working with the public or in close proximity to others and from performing work that requires the cooperation of others, directly accommodating the reason she cited for quitting many of her past jobs.

Finally, when discounting Dr. Patel's opinion, the ALJ also considered that Dr. Patel prepared the narrative report at Henning's request. Henning challenges this reasoning, and persuasively so, as the Seventh Circuit has stated that an ALJ may not discount a treating physician's opinion just because it was solicited by the claimant. *Punzio v. Astrue*, 630 F.3d 704, 712-13 (7th Cir. 2011) ("[T]he fact that relevant evidence has been solicited by the claimant . . . is not a sufficient justification to belittle or ignore that evidence."). But in this instance, the ALJ also considered the bias that a treating physician may employ. (Tr. 499); *see Hofslien,* 439 F.3d at 377; *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("The patient's regular physician may

want to do a favor for a friend and client, and so the treating physician may too quickly find disability." (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985))). Of course, "an ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their patients' disability claims." *Labonne v. Astrue*, 341 F. App'x 220, 225 (7th Cir. 2009) (unpublished) (citations omitted). Since the ALJ provided several other good reasons to discount Dr. Patel's opinion, the ALJ's comment concerning Henning's solicitation of the evidence falls short of reversible error. *See Fisher*, 869 F.2d at 1057 ("So the administrative law judge's opinion is vulnerable. But that is nothing new" and alone does not require remand).

"[I]n, the end, it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Books*, 91 F.3d 972, 979 (7th Cir. 1996) (citation omitted and internal quotation marks omitted); *accord Micus*, 979 F.2d at 608. Here, the ALJ's resolution of the internal insistencies within Dr. Patel's documentation, and the conflicts between Dr. Patel's June 2004 report and other substantial evidence of record, including Dr. Ciula's and Dr. Sibilla's evaluations, is supported by substantial evidence. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) ("[The Court's] role is extremely limited. We are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. In fact, even if reasonable minds could differ concerning whether [the claimant] is disabled, we must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported." (internal

quotation marks and citations omitted)). Therefore, Henning's argument that the ALJ improperly discounted Dr. Patel's opinion is unavailing.

*D. The ALJ's Credibility Determination Will Not Be Disturbed*

Henning also argues, in a mere one-paragraph argument, that the ALJ's credibility determination is improper because it is "conclusory" in that he "did not specifically analyze and give reasons why he discredited her testimony." (Opening Br. 23.) The record adequately defies Henning's terse assertion.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ opined as follows concerning Henning's credibility:

> Although the claimant's and her husband's testimony was somewhat exaggerated and not entirely credible, it reflected problems with social interaction which is consistent with the evidence. The undersigned believes that the claimant had social problems at work and has accordingly limited her to work that does not require her to interact with the public, work in close proximity to co-workers, and perform work that requires the cooperation of others.

(Tr. 500.) In reaching this credibility determination, the ALJ adequately considered the evidence

of record pertaining to her physical and psychological conditions. *See generally Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished) ("[W]e read the ALJ's decision as a whole and with common sense.").

For example, the ALJ noted that although Henning and her husband testified to side effects of significant sleepiness, the treatment records do not reflect reports of significant problems associated with medication side effects, with Dr. Patel being responsive to Henning's complaints and making adjustments in dosages as needed. (Tr. 493.) Similarly, the ALJ also noted that the treatment records of Henning's family practitioner, Dr. Sharp, did not reveal problems with medication side effects. *See Ellis v. Astrue*, No. 2:09-cv-145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of claimant's complaints of debilitating fatigue given the discrepancies between her self-reported symptoms and the lack of treatment for the purported condition).

And, although Henning and her husband testified that she could not work because she had difficulty concentrating and felt "spaced out," the findings of Dr. Ciula's and Dr. Sibilla's mental status evaluations did not reveal deficits in concentration. Of course, an ALJ is entitled to consider the objective medical evidence, or lack thereof, as a factor in assessing credibility and "may properly discount portions of a claimant's testimony based on discrepancies between [the c]laimant's allegations and objective medical evidence." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009); *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); 20 C.F.R.

§ 404.1529(c)(2); SSR 96-7p.

The ALJ also observed that Henning's mental health treatment had consisted of a relatively conservative course of medication management. An ALJ is instructed to consider the type of treatment that a claimant has undergone when determining that claimant's credibility. 20 C.F.R. § 404.929(c)(3) (considering a claimant's use of medications and treatment measures as two factors in analyzing claimant's subjective symptoms); SSR 96-7p; *see also Simila*, 573 F.3d at 519.

The ALJ also properly considered Henning's activities of daily living when assessing the credibility of her symptom testimony, finding that she was just minimally limited in that arena—a conclusion that was supported by Dr. Sibilla's findings. (Tr. 494.) The ALJ noted that Henning independently performed her self care and a variety of home care tasks, including cooking, doing dishes, feeding pets, gardening, preserving vegetables in the summer, and refinishing furniture. (Tr. 494-95.) She also maintained a checkbook; made a list of chores to accomplish; and went grocery shopping, holiday shopping, and to the laundromat. (Tr. 494-95); *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility); 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. In addition, the ALJ noted that Henning had worked in a variety of jobs prior to her alleged onset date despite the rather long-term nature of her psychological impairments. (Tr. 500); *see Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that [the claimant] was not at h[er] best, the fact that [s]he could perform some work cuts against h[er] claim that [s]he was totally disabled.").

Moreover, the ALJ did indeed credit Henning's symptom testimony to some extent,

acknowledging that her psychological impairments caused her problems with social interaction. (Tr. 500.) Accordingly, to accommodate these social limitations, the ALJ assigned an RFC that preclude her from working with the public or in close proximity to others, and from performing work that requires the cooperation of others. (Tr. 496, 500); *see, e.g.*, *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming ALJ's credibility determination where he discredited the claimant's symptom testimony only in part).

In sum, the ALJ adequately considered the credibility of Henning's symptom testimony in accordance with the factors identified in 20 C.F.R. § 404.1529(c) and ultimately determined that her symptoms were not of disabling severity. In doing so, the ALJ adequately built an accurate and logical bridge between the evidence and his conclusion, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, concerning Henning's symptom testimony will not be disturbed.

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Henning.

SO ORDERED.

Enter for this 22nd day of August, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge